OPINION OF THE COURT
Dominic R. Massaro, J.
Troy Radcliffe was arrested on July 16, 2001 for the attempted murder of a livery cabdriver occurring on June 28th in the vicinity of 157th Street and River Avenue in the Bronx. On July 3, 2001, the victim identified him from a photographic array while in a hospital bed, and on July 16th, further identified Mr. Radcliffe from a corporeal lineup as his assailant. The *382 accused was thereafter charged with attempted murder in the second degree (Penal Law §§ 110.00, 125.25 [1]) and related offenses.
Mr. Radcliffe now moves pretrial for permission to introduce the testimony of a social psychologist “expert in the field of eyewitness identification” for the purpose of explaining to the jury factors that ordinarily influence the perception and memory of a witness and affect the reliability of testimony. Advanced would be specialized knowledge that witnesses often make mistakes, and, specifically, that they tend to make more mistakes where “cross-racial identification” is involved. Mr. Radcliffe is black, his alleged victim is a Dominican national.[1] The State argues, inter alia, that there is no general acceptance in the scientific community to permit such testimony.
While “expert testimony proffered on the issue of the reliability of eyewitness identification * * * is not inadmissible per se, the decision whether to admit it rests in the sound discretion of the trial court” (People v Lee, 96 NY2d 157, 160 [2001]). Indeed, although expert psychological testimony on eyewitness identification satisfies the prevailing New York standard (see Frye v United States, 293 F 1013 [DC Cir 1923];[2] accord People v Wesley, 83 NY2d 417 [1994]; see generally, Kassin et al., On the “General Acceptance” of Eyewitness Research: A New Survey of the Experts, 56 Am Psychologist [No. 5] 405 [May 2001]), it is not an abuse of discretion to exclude such testimony as the circumstances of a case might dictate. Such is not the particular case at bar. The motion is granted.
Facts
In the evening of June 28, 2001, Mr. Jose Cruz was working as a livery cabdriver. Shortly before 8:30 p.m., he picked up a fare on First Avenue between 100th and 101st Streets in Manhattan. Mr. Cruz was instructed to drive to Yankee Stadium. The fare rode in the backseat of the livery cab which contained a plastic divider between the front and backseats. Mr. Cruz alleges that upon reaching nearby the stadium, the passenger told him to stop and produced a handgun for the purpose of robbery. A struggle ensued to the extent that the assailant attempted to open the partition, while Mr. Cruz at *383 tempted to keep it closed. Several shots were fired at the driver, striking Mr. Cruz in his chest and hand. The culprit then fled the scene.
Traditional Safeguards
Our system of justice has traditionally relied upon adversarial cross-examination as a mechanism to alert the jury to any inaccuracies or inconsistencies in the direct testimony of an eyewitness.[3] Where linked with inferential closing argument and coupled with proper cautionary instructions regarding eyewitness testimony, the generalized knowledge possessed by the jury is presumed to be able to assess the credibility and reliability of each witness.
New York’s appellate courts have repeatedly cautioned that when eyewitness identification is a critical issue, the trial court is obligated to give the jury a discreet and specific instruction that provides appropriate guidelines to focus attention on how to analyze and consider the trustworthiness of such identification (see People v Knight, 87 NY2d 873 [1995] [requiring sufficient appraisal that proof beyond a reasonable doubt is the standard]; People v Whalen, 59 NY2d 273 [1983] [discretion to give more detailed identification charge where appropriate]; People v Ruffino, 110 AD2d 198 [2d Dept 1985] [expanded charge to consider both truthfulness and accuracy of eyewitness identification]; People v Daniels, 88 AD2d 392 [2d Dept 1982] [directing focus on accuracy in addition to veracity]). Indeed, the touchstone of identification testimony is in its accuracy.
Eyewitness Identification
The greatest danger of conviction of the innocent exists in “sole eyewitness” cases. Those are the cases where, apart from the eyewitness testimony, there is no other evidence connecting defendant with the commission of the crime. “The potential for inaccuracy in visual identification is well known to the legal community * * * and has been recognized by the Supreme Court [of the United States]” (People v Whalen, supra *384 at 278; see also, United States v Smithers, 212 F3d 306 [6th Cir 2000] [collecting cases in support of admission of expert testimony on eyewitness identification]). A separate jury instruction is available for use when identification is premised solely on the testimony of one witness (see CJI[NY]2d Identification — One Witness [2001]). However, the question of “ ‘[c]ross-racial identification’ is an area not covered by the current standard jury instruction and is an area that may lend itself to expert testimony” (People v Radcliffe, 191 Misc 2d 545, 550 [Sup Ct, Bronx County 2002]). This court accords.
“[T]he issue of admissibility of expert testimony regarding the reliability of eyewitness identification * * * remains * * * unresolved in this State” (People v Lee, supra at 157; see People v Radcliffe, supra; People v LeGrand, 196 Misc 2d 179 [Sup Ct, Bronx County 2002] [expert eyewitness opinion denied]; People v Smith, 191 Misc 2d 765 [Sup Ct, NY County 2002] [expert eyewitness opinion granted]). Other jurisdictions have treated with it more extensively (see generally, 1 McCormick on Evidence § 206, at 776-779 [5th ed 1999]).
Notwithstanding, concern over the reliability of eyewitness testimony lies at the heart of Supreme Court decisions in cases involving pretrial identification procedures (see e.g. United States v Wade, 388 US 218 [1967]; Stovall v Denno, 388 US 293 [1967]; accord People v Ballott, 20 NY2d 600 [1967]). “The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification” (United States v Wade, supra at 228). The Wade Court noted “the high incidence of miscarriage[s] of justice” caused by such misidentifications and that “even when uncontradicted * * * identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials” (id. [internal quotation marks omitted], quoting Felix Frankfurter, The Case of Sacco and Vanzetti, at 30 [1927]).
The Second Circuit has observed that “[c]enturies of experience in the administration of criminal justice have shown that convictions based solely on testimony that identifies a defendant previously unknown to the witness is highly suspect [and] the least reliable, especially where unsupported by corroborating evidence” (Jackson v Fogg, 589 F2d 108, 112 [2d Cir 1978]). “Bitter experience tells us * * * that the real issue is whether or not the witness is mistaken — however honest or truthful the mistake might be * * *” (People v Daniels, 88 AD2d 392, 400 [2d Dept 1982]).
*385 Cross-Racial Identification
It has been recognized by the courts that “[cjross-racial identifications are much less likely to be accurate than same race identifications” (Arizona v Youngblood, 488 US 51, 72 n 8 [1988], reh denied 488 US 1051 [1989]; State v Cromedy, 158 NJ 112, 727 A2d 457 [1999]).
A cross-racial identification occurs when an eyewitness is asked to identify a person of another race. It has become one of the most researched issues in eyewitness identification today. Inexorably, the studies are conclusive that human perception is inexact and that human memory is fallible; where cross-racial identification is involved, this is especially so (see Davenport et al., Eyewitness Identification Evidence: Evaluating Commonsense Evaluation, 3 Psychol, Pub Pol’y, & L 338 [1997]). About this fact, prosecutors, defense attorneys and members of the bench agree (see Johnson, Cross-Racial Identification Errors in Criminal Cases, 69 Cornell L Rev 934 [1984]; Brigham & WolfsKeil, Opinions of Attorneys and Law Enforcement Personnel on the Accuracy of Eyewitness Identifications, 7 Law & Hum Behav 337 [1983]). The Supreme Court first acknowledged the difficulty a quarter century ago in Manson v Brathwaite (432 US 98, 115 [1977]). Manson (supra), as did Wade (supra) before it, cited a classic study on eyewitness identification, which included a dramatic case of cross-racial misidentification (see Wall, Eye-witness Identification in Criminal Cases [Charles Thomas: Springfield, 111 1965]). Five victims, all of whom spent several hours with the perpetrator of a kidnapping, rape and robbery, each identified a male subsequently proven to have been far removed at the time of the offense. Upon apprehension of the true criminal, it was apparent that, other than the fact that he was black, he bore no resemblance whatsoever to the original suspect. Professor Wall commented (at 122): “In general, there is much greater possibility of error where the races are different than where they are the same. Where they are different, there is more likelihood of error where the subject belongs to a minority group and the witness to a majority group * *
When this was written in 1965, there was no empirical evidence to support the impression. This is not the present circumstance. Empirical studies concerning the psychological factors that bear upon the reliability of this phenomenon, *386 known as “own-race bias,”[4] are appearing with increasing frequency. Its robustness has been noted (see Chance and Gold-stein, The Other-Race Effect and Eyewitness Identification, in Sporer et al., Psychological Issues in Eyewitness Identification [Erlbaum: Mahwah, NJ 1996]; Brigham and Malpass, The Role of Experience and Contact in the Recognition of Faces of Own- and Other-Race Persons, 41 J of Soc Issues [No. 3] 139 [1985]); and researchers have endorsed the importance and reliability of the effect (see Kassin et al., On the “General Acceptance” of Eyewitness Testimony Research: A New Survey of the Experts, 44 Am Psychologist 1089 [1989]; Yarmey and Jones, Is the Psychology of Eyewitness Identification a Matter of Common Sense, in Lloyd-Bostock et al., Evaluating Witness Evidence: Recent Psychological Research and New Perspectives [Wiley & Sons: Chichester, Eng 1983]). Furthermore, expert witnesses have cited it in cases involving disputed cross-race identification (see Brigham et al., Disputed Eyewitness Identification Evidence: Important Legal and Scientific Issues, 36 Ct Rev [No. 2] 12 [1999]; Leippe, The Case for Expert Testimony About Eyewitness Memory, 1 Psychol, Pub Pol’y, & L [No. 4] 909 [1995]); and studies have concluded that eyewitnesses are superior at identifying persons of their own race and have difficulty identifying members of another race (see Platz and Hosch, Cross-Racial /Ethnic Eyewitness Identification: A Field Study, 18 J Applied Soc Psychol 972 [1988]; Wells and Loftus, Eyewitness Testimony: Psychological Perspectives [Cambridge U Press 1984]; Loftus, Eyewitness Testimony [Harvard U Press 1979]). The difficulty with cross-racial identification is so commonplace as to have become the subject of both cliche and joke: “They all look alike” (Johnson, supra at 942). The consistency of findings across a variety of methodologies converge on the conclusion that the own-race effect is real and must be dealt with realistically.
In light of this growing body of research, the professional literature of behavioral and social science, reporting with systematic empirical validation, can be said to have found sufficient reliability to advance the phenomenon and to support a broad consensus of its scientific respectability to be admitted at trial. This to the level that there is general acceptance of same within the community of academic experts (see Kassin et al. [2001], supra’, Wells and Olson, The Other-Race Effect in Eyewitness Identification: What Do We Do About It, 7 Psychol, Pub Pol’y, & L 230 [2001]) allowing it as a subject of judicial notice.
*387 In essence, Frye (supra) predicates the admissibility of scientific evidence on the assumption that general acceptance in the scientific community is indicative of reliability to allow an opinion of evidential force to be asserted in the courtroom. Our Court of Appeals explained the prevailing Frye standard governing New York law: “[T]he test is not whether a particular procedure is unanimously endorsed by the scientific community, but whether it is generally acceptable as reliable” (People v Middleton, 54 NY2d 42, 49 [1981]; see also People v Wesley, 83 NY2d 417, 423 [1994]). The remaining question is whether there is a need for, and, if so, will the sharing of this information be helpful to the trier of fact.
Limited Admissibility
In the pending case, the identity of defendant is the critical issue. There is no forensic or corroborating evidence giving it independent reliability. Additionally, the facts are such that the accuracy of the complainant in making an identification vis-a-vis an initial police sketch artist composite to serve as a basis for his later photographic array and lineup identification(s) of Mr. Radcliffe is wrought with suggestiveness. It is proffered by the defense that a third, unrelated party assisted in composing of the drawing later relied upon by the sole eyewitness. All this within the context of heightened opportunity for error in cross-racial identification. In balancing such circumstances, the limited admissibility of expert testimony to explain factors that could affect the accuracy of the identification not likely to be fully known or understood by the jury is deemed helpful and appropriate.
Our Court of Appeals has instructed, “[e]xpert opinion testimony is used in partial substitution for the jury’s otherwise exclusive province which is to draw ‘conclusions from the facts.’ It is a kind of authorized encroachment in that respect” (People v Lee, supra at 162, citing People v Jones, 73 NY2d 427, 430-431 [1989], quoting People v Cronin, 60 NY2d 430, 432 [1983]). To allow it here — properly qualified and within a carefully circumscribed general analytical framework for evaluating testimony — where a distinct set of facts raises distinct legal questions, is relevant and not an unreasonable application of clearly directive New York law.
Conclusion
Until the law of New York settles on the parameters of expert identification testimony or advances an expanded pattern jury *388 instruction in the arena of cross-racial identification, this court holds these minimum standards for testimonial admissibility applicable, and so finds them: the identification of the defendant is the principal issue; the only evidence of identification is by a single eyewitness and stands uncorroborated by any other evidence; cross-racial identification is a critical factor in the underlying identification process.
It is necessary that jurors should have the best possible degree of understanding of the subject toward which the law of evidence strives. To curtail expert testimony on interracial identification and how it may interplay with the centrality of the identification issue in the particular facts and the special circumstances of this occasion will force the jury to search for truth without the opportunity of education beyond the ken of common assumptions of the typical juror, likewise, without wider knowledge and opportunity to fully evaluate the strength of the evidence in the proper discharge of their obligation to resolve material issues of fact.

. It is beyond cavil that Fourteenth Amendment jurisprudence equates the cognizability of race with nationality.

. In the jurisdictions that follow Frye, scientific testimony is admissible only if it is based on an underlying theory or research finding that enjoys “general acceptance in the particular field in which it belongs” (Frye v United States, supra at 1014).

. “Hamlet: Do you see yonder cloud, that’s almost in the shape of a camel?
“Polonius: By the mass, and ‘tis like a camel indeed.
“Hamlet: Methinks, it is like a weasel.
“Polonius: It is backed like a weasel.
“Hamlet: Or like a whale?
“Polonius: Very like a whale.” (Hamlet, act III, scene ii.)

. “Own-race effect” has been suggested as a more neutral description of the phenomenon than “own-race bias” because of the connotation in the word “bias” to suggest prejudice as a potential cause. It is well taken.