OPINION OF THE COURT
James A. Yates, J.
Anthony Smith is charged with the commission of three *766 robberies. He is alleged to have robbed a Gymboree store at 1049 Third Avenue on April 18, 2001 and then again on June 15, 2001. As well, he is charged with a robbery at an American Airlines office located at 1843 Broadway later in the day on June 15, 2001. On June 17th, an eyewitness to both robberies at the Gymboree store picked the defendant’s picture out of a photo array. A witness to the American Airlines incident was shown the same array, but did not make an identification. The defendant was arrested on July 7, 2001 and placed in a series of lineups on August 1st. At the lineups, the same two witnesses identified the defendant. Four other witnesses to the robberies saw the defendant in a lineup, but did not identify him.
The case against Mr. Smith will depend entirely upon the accuracy of the eyewitness identifications. There is no independent corroborating evidence to support the charges. Because separate robberies have been joined in one indictment, there will be two identifying witnesses, but each charge will depend solely upon a single eyewitness identification. Mr. Smith intends to call, as an expert witness, Dr. Solomon M. Fulero, a clinical psychologist and a recognized expert in the area of memory and perception.[1] Professor Fulero would testify about perceptual, cognitive and social factors including stress, event violence, cross-racial impact, and exposure time that affect the reliability and accuracy of eyewitness identification. The defendant relies upon People v Lee (96 NY2d 157 [2001]) which held that, with regard to this field of study, “the admissibility and limits of expert testimony lie primarily in the sound discretion of the trial court.” (Id. at 162).
Admissibility under Frye and Wesley
As a preliminary matter, the People question the reliability of the proffered testimony. They ask for a hearing to examine if it is generally accepted in the relevant scientific community (see Frye v United States, 293 F 1013 [DC Cir 1923]; People v Wesley, 83 NY2d 417 [1994]). In Lee, the Court anticipated that “expert testimony of this nature may involve novel scientific theories and techniques, [in which case] a trial court may need to determine whether the proffered expert testimony is *767 generally accepted by the relevant scientific community.” (People v Lee, 96 NY2d at 162.) The People cite this caution as grounds for challenging the proffered testimony in its entirety. This misreads Lee. To the extent that the testimony is helpful and offered by one who is trained, experienced or skilled in the relevant field of study, but does not involve a novel scientific theory or technique, a Frye hearing is unnecessary. The broad field of study involving subjective and objective factors which may affect the reliability of an identification does not necessarily depend upon any particularly novel experiment or technique, but instead describes observations and studies by a wide range of scholars who have observed and examined cognizable behavioral patterns connected with the accuracy of eyewitness testimony. (See e.g. Wells, From the Lab to the Police Station: A Successful Application of Eyewitness Research, Am Psychologist, at 590 [June 2000]; Lieppe, The Case for Expert Testimony about Eyewitness Memory, 1 Psychol, Pub Pol’y & L 909, 919-920 [1995]; Yuille & Cutshall, A Case Study of Eyewitness Memory of a Crime, 71 J Applied Psychol 291-301 [1986]; Wells & Loftus, Eyewitness Testimony: Psychological Perspectives, at 1 [1984]; Lindsay, Wells & Rumpel, Can People Detect Eyewitness-Identification Accuracy Within and Across Situations, 66 J Applied Psychol 79 [1981]; see also Chance & Goldstein, The Other Race Effect and Eyewitness Identification, reprinted in Psychological Issues in Eyewitness Identification, at 153 [Sporer, Malpass & Koehnken eds 1996]; Wright & Mc-Daid, Comparing System and Estimator Variables Using Data from Real Lineups, 10 Applied Cognitive Psychol 75-84 [1996]; Platz & Hosch, Cross-Racial/Ethnic Eyewitness Identification: A Field Study, 18 J Applied Soc Psychol 972 [1988]; Johnson, Cross-Racial Identification Errors In Criminal Cases, 69 Cornell L Rev 934 [June 1984]; Malpass & Kravitz, Recognition for Faces of Own and Other Race, 13 J Personality & Soc Psychol 330 [1969].) In the case before the court, the defendant has not offered to have Dr. Fulero put forward a novel test or technique. Instead he will merely describe academic research and writings in a recognized field of study and discuss the factors in the present case which may affect the ability to identify accurately.
Where, as here, it is clearly demonstrated that certain recurring phenomena and derivative patterns of human behavior have been observed, studied, recorded, analyzed and published in academic literature and pervasively subjected to peer review, the court will permit conclusions and opinions offered by a recognized expert in the field of study without the necessity of *768 a pretrial Frye hearing. (See e.g. People v Taylor, 75 NY2d 277 [1990] [allowing testimony of patterns of response exhibited by rape victims based upon recognized writings without requiring further Frye inquiry]; People v Brown, 97 NY2d 500, 502 [2002] [permitting testimony by police experts of patterns of behavior in drug sales without a Frye hearing]; see also Matter of Nicole V., 71 NY2d 112 [1987] [sexually abused child syndrome]; People v Keindl, 68 NY2d 410, 422, rearg denied 69 NY2d 823 [1987] [psychological reactions of children sexually abused by a stepparent]; Selkowitz v County of Nassau, 45 NY2d 97 [1978] [proper police procedures in a high-speed chase]; People v Henson, 33 NY2d 63, 73-74 [1973] [battered child syndrome]; People v Right, 180 AD2d 430, 431 [1st Dept], lv denied 79 NY2d 952 [1992] [pickpocketing methods]; People v Ciervo, 123 AD2d 393 [1986] [battered wife syndrome].)
Furthermore, a number of courts have previously considered this very issue and determined that the Frye test has been met. (See People v Drake, 188 Misc 2d 210 [Sup Ct, NY County 2001]; People v Beckford, 141 Misc 2d 71 [Sup Ct, Kings County 1988]; People v Lewis, 137 Misc 2d 84, 86 [Monroe County Ct 1987] [citing to “an extensive body of scientific studies that detail the processing of information, perception, memory and recall”]; People v Brooks, 128 Misc 2d 608 [Westchester County Ct 1985].) This court sees no need to duplicate or authenticate the results of previous court determinations, permitting expert testimony on eyewitness identifications. Instead, the court can rely, in part, upon the previous rulings as an aid in determining the acceptability of the proffered testimony. (People v Ellis, 170 Misc 2d 945 [Sup Ct, NY County 1996], affd 274 AD2d 338, lv denied 95 NY2d 934 [2000] [finding prior determinations of admissibility of testimony regarding battered woman’s syndrome sufficient to justify admission of expert testimony without a de novo hearing].)
Admissibility under Lee
In Lee, the Court held that expert testimony concerning the reliability of an identification should be treated in the same manner as any other opinion evidence offered by experts. The Court rejected the contention that expert testimony in this field was somehow suspect or should be subjected to special preconditions not applicable to other expert opinion testimony. The appropriate test, as described in Lee, is to “weigh the request against other relevant factors, such as the centrality of the identification issue and the existence of corroborating evidence.” (Id. at 163.)
*769 In this case, there is no corroborating evidence. As to the “centrality of the identification issue” the opportunity to observe the defendant was limited. In one instance, the People have described the time of observation as “a few seconds.” Another viewing was said to have occurred as the witness “peered from the storeroom, and from a distance of approximately twenty feet.” The robberies involved exceptionally stressful situations, having been accomplished at knife point and including, in one case, a struggle and slashing. The lineup identifications were, respectively, 1V2 and 3V2 months after the incidents. The photo array, in the case of one of the intended witnesses, resulted in a negative identification. As previously indicated, four out of six witnesses to the incidents did not select the defendant at a lineup.
The robberies, if separately prosecuted, would give rise to the customary caution that properly attends one-witness identification cases. Here, because the People have joined two unrelated robberies, each separately supported by one-eyewitness identification, there is a potential peril that the joint presentation, merely because the cases are joined, will, in the minds of the jurors, bolster the reliability of the separate identifications. The court, in fairness to the defense, has an obligation to allow close examination of the identification testimony. As such, applying the Lee test, i.e., weighing the centrality of the identification issue and the (lack of) corroborating evidence, the court is impelled to permit Dr. Fulero’s testimony.
In a recent, thoughtful, decision in Supreme Court, Criminal Term, Bronx County, the court wrote that the issue of admissibility of this kind of testimony should be determined pretrial at which time the applicant would be asked to meet five requirements:
“(1) to the extent known [the applicant must] set forth the pertinent alleged facts of the identification and any corroborative evidence; (2) set forth the name and qualifications of the witness and the ‘proffered’ testimony; (3) correlate the proffered testimony with the facts of the case to demonstrate the relevance of the expert testimony; (4) explain whether the testimony involves ‘novel scientific theories and techniques,’ and if it does, include an offer of proof as to its general acceptance by the relevant scientific community; and (5) explain why the testimony is warranted if an existing standard jury *770 instruction (CJI2d[NY] Identification — One Witness [2001]) would appear to cover the area of the proffered expert testimony.” (People v Radcliffe, 191 Misc 2d 545, 548.)
This court respectfully disagrees for several reasons. In the first place, the rule would seek to distinguish expert testimony in this area from other expert testimony. As previously noted, courts frequently allow experts to testify about child abuse syndrome, posttraumatic stress disorder, rape trauma syndrome, battered wife syndrome, the roles of separate participants in drug transactions and a host of other experiential matters without erecting a string of five hurdles to be overcome. The teaching of Lee is that the testimony of experts concerning the reliability of eyewitness identification testimony is not to be treated as a suspect class of opinion evidence. Since it is the defense that customarily seeks to introduce expert evidence on eyewitness identification, the net effect of the suggested rule in Radcliffe in the typical case would be to place a burden upon the defense that is not placed upon the People when they seek to introduce expert testimony in aid of a prosecution. The added burden is not permitted by Lee and is not justifiable.
Secondly, the rule would demand discovery of the defense and commitment to a specific proffer in advance of trial. Absent statutory authority, a trial court cannot order discovery of a party in a criminal proceeding. (Matter of Constantine v Leto, 77 NY2d 975 [1991]; People v Bagley, 279 AD2d 426 [1st Dept 2001]; compare People v Almonor, 93 NY2d 571 [1999] [permitting compelled disclosure of a defendant not required by, but consonant with, the statutory notice provisions of CPL 250.10].) A court cannot compel a defendant to commit to a given defense before trial. (People v Brown, 98 NY2d 226.)
In a case centering on the issue of identity, the defendant, especially an innocent one, is not usually in a position to “correlate the proffered testimony with the facts of the case to demonstrate the relevance of the expert testimony” as required by Radcliffe (at 548). It may be, as the court in Radcliffe points out, that “[t]he District Attorney of Bronx County commendably supports pretrial discovery that exceeds legal requirements.” (Id. at 548 n 4.) Given liberal voluntary, or mandated, discovery a defendant may be able to discuss the facts and apply them to the proffer. However, without greater discovery than present law provides, it is problematic to require specific correlation. For example, Radcliffe discusses a compari *771 son of the defendant with descriptions given by the witness— but in the usual case in New York County, the defense won’t know what descriptions were provided. Radcliffe discusses circumstances surrounding the creation of a composite sketch and photographic identifications whereas in New York County the defendant frequently will not know anything about those circumstances until the day of hearing or trial. As to the facts surrounding the initial observation, the defendant has no way of knowing whether the observation was brief or studied; whether the lighting was good or bad; whether the opportunity to observe was impaired or unimpaired; whether the witness was distraught or calm. A central thesis in expert testimony surrounds “cross-racial” identification. But, in New York County, a prosecution frequently proceeds without any description of the complainant. How is a defendant to “correlate” the proffer with this factor without guesswork? Similarly, circumstances surrounding the lineup or showup procedure are not discoverable. How can a defendant proffer information about suggestiveness in the identification proceeding when the defendant knows nothing about what the witness was told or shown before the proceeding and is separated from the witness at the time of the identification?[2]
In People v Brooks (128 Misc 2d 608, supra), the court reviewed the literature in the area and compiled a list of factors which are generally recognized as pertinent to expert testimony. They included:
“(1) the delay between the event and the identification;
“(2) stress;
“(3) the violence of the situation;
“(4) assimilation of postevent information;
“(5) the cross-racial aspect of the identification;
“(6) the selectivity of perception;
“(7) the ‘filling in’ phenomenon;
“(8) expectancy;
“(9) the effect of repeated viewings;
“(10) the lack of a correlation between confidence and reliability;
“(11) the motivation of the victim to make a correct identification;
*772 “(12) the motivation of the police to make an arrest;
“(13) the introduction of suggestiveness through photo arrays;
“(14) the availability of a ‘zero option;’ and
“(15) the effect of what a witness is told after the identification is made.” (Id. at 609.)
The proffer demanded in Radcliffe would, of necessity, discuss each of these factors. However, with the limited pretrial discovery permitted in New York, correlation of the 15 factors with available evidence is not possible in advance of trial. The court in Radcliffe imposed a further requirement: the defendant is to explain why the testimony is warranted if an existing standard jury instruction would appear to cover the area of the proffered testimony. Presumably, because there may be some overlap between the testimony and the court’s instructions the expert testimony could become unnecessary. However, a court’s instruction on the law is not a substitute for testimony or advocacy. Limiting proffered expert testimony on the grounds that a jury instruction is sufficient, in effect asks jurors to decide the issues based upon their own knowledge, background and common sense without allowing the defense to present helpful evidence in support of its position. Instead, the critical question should be whether the testimony could be helpful to the factfinder. The Court in Lee wrote, “Despite the fact that jurors may be familiar from their own experience with factors relevant to the reliability of eyewitness observation and identification, it cannot be said that psychological studies regarding the accuracy of an identification are within the ken of the typical juror.” (People v Lee, 96 NY2d at 162.) The Court further added, “courts should be wary not to exclude such testimony merely because, to some degree, it invades the jury’s province.” (Id.) A fortiori, this applies as well to jury instructions.
This court appreciates the fact that if the defense is not permitted to call an expert witness, it may still have an opportunity to address the identification issue by cross-examination, by argument in summation and by reliance upon the jury instructions. However, cross-examination, argument and instruction are not alternatives to testimony by a defense expert. The very argument was made and rejected by the Court of Appeals when it reversed a conviction in People v Aphaylath (68 NY2d 945, rearg dismissed 69 NY2d 724 [1987]). There, the “defense was able to present some evidence of the Laotian culture through the cross-examination of two prosecution wit *773 nesses and through the testimony of defendant himself * * * [but] [defendant's ability to adequately establish his defense was impermissibly curtailed by the trial court’s exclusion of the proffered testimony of two expert witnesses concerning the stress and disorientation encountered by Laotian refugees in attempting to assimilate into the American culture.” (Id. at 946-947.)
Prior to Lee, other courts had disallowed identification-expert testimony on grounds similar to that advanced in Radcliffe. For example, in United States v Amaral (488 F2d 1148, 1153 [9th Cir 1973]) the court rationalized exclusion by stating that “the effects of stress on perception can be effectively communicated to the jury by probing questioning of the witnesses.” But this is precisely the analysis which was rejected by Lee and Aphaylath. Cross-examination, as suggested by Amaral, or jury instructions, as suggested in Radcliffe, are not substitutes for expert testimony offered by the defense. In the appropriate case, expert testimony plays a role separate and independent of cross-examination or jury instruction.
In fact, it may be improper to attempt to use jury instructions in lieu of the proffered defense testimony. The situation would not be dissimilar to that in People v Alexander (94 NY2d 382 [1999]), where a conviction was reversed because a prosecutor, in summation, argued that an identification was reliable because it was not cross-racial. The Court reversed the conviction, not because it agreed or disagreed with the prosecutor’s argument, but more importantly because “[t]he issue of race-based identification formed no part of the record in this case. By raising it for the first time during closing argument, the prosecutor had the sole, final, inapt word on the subject.” (Id. at 385.) For the same reason, here, the defense would be precluded from presenting arguments in summation that involve expert opinion beyond the ken of jurors when such opinion evidence was not part of the record at trial. While it is true that CJI directs the jury’s attention to pertinent aspects of identification testimony, it does not provide the defense with the opportunity to present and argue the kind of opinion evidence that Dr. Fulero’s testimony would supply. If the witness is not allowed to testify, then the parties could not refer to the points the expert may have made if he had been called. In sum, although CJI may cover the area to some extent, that is not a reason to exclude the testimony of the expert witness once the determination has been made that his testimony would be helpful on the central issue of identification.
*774 Accordingly, the prosecution motion to preclude testimony by Dr. Fulero is denied.

. The defense has submitted a resume listing Dr. Fulero’s qualifications. In addition, he has testified as an expert on other occasions, including another, recently concluded, case before this court, where the People did not request a Frye hearing.

. The Legislature recognized that it was unfair to place a burden on a defendant to allege facts describing an identification procedure, to which the defendant was not a witness, when it eliminated that requirement as a prerequisite to a hearing on a motion to suppress in GPL 710.60 (L 1986, ch 776, as amended).